**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:22-CR-199** |
| Plaintiff, | |
| vs. | **JUDGE SARAH D. MORRISON** |
| **EMMA M. BARROWS,** | |
| Defendant. | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits this Sentencing Memorandum in connection with Emma M. Barrows's upcoming sentencing hearing. The Government agrees with the factual findings and guideline calculations from the Presentence Investigation Report, which yields a range of 0–6 months. The Government recommends that the Court impose a **one-year term of probation** in lieu of incarceration, in accordance with 18 U.S.C. § 3561(c)(1) and U.S.S.G. § 5C1.1(b).

**I. BACKGROUND**

On October 13, 2022, the United States Attorney filed a one-count Bill of Information against Barrows, which charged her with providing false statements to Deputy United States Marshals during their investigation into her husband's whereabouts. PSR, ECF No. 14, ¶¶ 1-2. On November 5, 2022, Barrows pled guilty to that charge pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A). *Id.* at ¶ 3.

Barrows's guilty plea stemmed from an investigation by the Marshals Service into the whereabouts of her husband, William J. Dishman. *Id.* at ¶ 8. Dishman was on supervised release at the time, and this Court had issued a warrant for his arrest because he had absconded from supervision. *Id.* at ¶ 9. On August 6, 2021, members of the Southern Ohio Fugitive Apprehension Strike Team ("SOFAST") traveled to an apartment in Cincinnati to arrest him. *Id.* Upon arrival, SOFAST members observed a car parked in the lot that was registered to Dishman's mother, and the apartment manager confirmed that Dishman resided there. *Id.*

SOFAST members then knocked on the apartment door and announced their purpose. *Id.* at ¶ 10. Barrows answered the door. *Id.* When a deputy U.S. Marshal asked about Dishman's whereabouts, Barrows lied to him. *Id.* First, she claimed that Dishman was not home. *Id.* Second, she claimed that she had not seen him since the 4th of July holiday. *Id.* After lying to the deputy about her husband's whereabouts, Barrows gave consent to search the apartment. *Id.* Once inside, SOFAST members found Dishman hiding in a wooden box beneath an HVAC unit in a closet. *Id.* Officers arrested Dishman; fortunately, no one was hurt. *Id.*

While searching the apartment, SOFAST members found three firearms in plain view, including an AR-556 assault rifle with an extended drum magazine attached. *Id.* at ¶ 11. Barrows then gave officers permission to search the residence for other weapons, at which point they located two more firearms. *Id.* Every firearm was loaded, and one of them (a handgun) was stuffed into a couch where Dishman's then-ten-year-old son was resting. *See id.*

After officers found the additional firearms, Barrows provided a written statement in which she claimed ownership of the AR-556 assault rifle and a Sig Sauer 9mm pistol. *Id.* at ¶ 12. She denied owning the other three firearms, however, and claimed that they belonged to Dishman. *Id.* In her written statement, Barrows also claimed that "[t]he reason I lied to the officers [about Dishman's whereabouts] is because I was worried about what William would do & the consequences if I did tell the officers he was inside because of past physical violence in our relationship." (*See* Barrows Statement, attached as Ex. 1).

Dishman was later indicted for being a felon in possession of multiple firearms. *See* PSR, ¶ 6. While his case was pending, he filed a pro se motion to dismiss his case. (Case No. 2:21-cr-208, ECF No. 20). Among other baseless claims, he alleged that federal agents "knowingly and willfully add[ed] a perjured statement made by my wife 'Emma Barrow [sic],'" referencing her statement from the day of the search. (*Id.* at PAGEID #53). Dishman claimed that "Barrows, under duress and fear from intimidation and threats of federal prosecution (harboring a fugitive) did write a statement with direct involvement and coercion from [deputy U.S. Marshals] with inaccurate facts and misleading statements to suit their needs." (*Id.* at 54). Dishman included a letter and an affidavit that Barrows wrote to support his motion to dismiss. (ECF No. 20-1). In that letter, Barrows tried to recant her statement from the day of the search regarding who possessed which firearms. (*Id.*). This time, Barrows claimed that "[a]ll of the firearms [recovered] are mine." (*Id.* at PAGEID #64).[1]

---

[1] The Court later struck Dishman's motion to dismiss, including Barrows's accompanying letter and affidavit, in its entirety. (*See* Notation Order, ECF No. 23).

3

Dishman later disavowed the claims he made in his pro se motion to dismiss, decided to stick with his appointed counsel, and ultimately pled guilty to the charge of being a felon in possession of multiple firearms. (*See* ECF Nos. 22–27). As part of his guilty plea, Dishman acknowledged that he possessed the three firearms that Barrows initially claimed were his but later attempted to claim belonged to her. (Plea Agreement, ECF No. 25, PAGEID #94). Dishman was later sentenced to a term of 48-months of imprisonment in that case. (J&C, ECF No. 46).[2]

After Dishman's case concluded, the United States Attorney charged Barrows with providing false statements to federal law enforcement agents on the day of the search. PSR, ¶ 1. The parties then entered into a non-binding plea agreement under Rule 11(c)(1)(A). *Id.* at ¶ 3. In that agreement, the parties reached several advisory sentencing stipulations, including a Base Offense Level of 6 and a 2-level reduction given her timely acceptance of responsibility, resulting in a Total Offense Level of 4. *Id.* at ¶ 4. The parties did not, however, reach any agreement as to her Criminal History Category. *Id.*

On February 1, 2023, the Probation Officer released Barrows's Final PSR. The Probation Officer calculated a Total Offense Level of 4, which mirrors the parties' recommendation, and a Criminal History Category of I, which yields a sentencing range of 0–6 months. *Id.* at ¶ 64. Neither party has objected to those guideline calculations.

---

[2] The Court also revoked Dishman's supervised release and sentenced him to a 12-month consecutive term of imprisonment as a sanction for his violations.

4

## II.  LEGAL STANDARDS

After *Booker v. United States*, 543 U.S. 220 (2005), district courts must engage in a three-step sentencing procedure.  Courts must first determine the applicable guidelines range, then consider whether a departure from that range is appropriate, and finally, consider the applicable guidelines range—along with all the factors listed in 18 U.S.C. § 3553(a)—to determine what sentence to impose.  The central command in imposing a sentence is to fashion one that is sufficient, but not greater than necessary, to meet the goals set forth in § 3553(a).

## III.  ANALYSIS

### A.  The Applicable Guidelines Range

The Probation Officer calculated a Total Offense Level of 4 and a Criminal History Category of I, resulting in a guidelines range of 0–6 months.  PSR, ¶ 64.  Neither party has objected to those calculations.

### B.  Possible Departures from the Applicable Guidelines Range

The Probation Officer did not identify any factors that would warrant a departure from the applicable guidelines range.  *Id.* at ¶ 77.  The Government agrees that no departures from the applicable guidelines range are appropriate.

### C.  Consideration of the Sentencing Factors from 18 U.S.C. § 3553(a)

Finally, the Court must consider the applicable guidelines range alongside the sentencing factors outlined in 18 U.S.C. § 3553(a) to fashion a sentence that is sufficient, but not greater than necessary, to meet Congress's sentencing goals.  As explained below, a one-year term of probation is sufficient to meet those goals.

1. The Nature and Circumstances of the Offense

The nature and circumstances of the offense are more troubling than the statute of conviction suggests. Barrows did not simply lie to federal agents during their investigation into her husband's whereabouts. She did so while agents were present to execute an arrest warrant at her home. And she did so with knowledge that Dishman was a violent criminal, who had absconded from supervision, and who had five loaded firearms within the apartment where he was hiding.

In short, Barrows created the potential for an ambush. Her lies could have led to the agents' death or injury, as well as the death or injury of herself, her husband, and her husband's ten-year-old son. Deputy Marshals and other law enforcement officers who join the SOFAST Team do so with the understanding that every time they go out to arrest a fugitive, they risk some danger. They don't need individuals in the community heightening that risk by lying to them about the circumstances they are about to confront inside an unknown location. Fortunately, no one was injured while SOFAST members arrested Dishman. But that outcome was far from guaranteed when Barrows first spoke to them.

Barrows's conduct following her husband's arrest is equally troubling. While his federal case was pending, she went along with his gambit to get that case dismissed by submitting materials to the Court in which she recanted her prior statements and attempted to take credit for all the firearms found in their home. Lying to federal agents and attempting to obstruct justice are no small matters, and they require serious consideration in this sentencing.

6

### 2. The History and Characteristics of the Defendant

Barrows's history and characteristics are tragic and explain, in part, why she is in federal court for sentencing. By all accounts, she is a strong, capable, caring, and educated woman whose life appeared on track for success. Things took a turn for the worse when she was fifteen years old. Her parents divorced, her new stepfather was abusive, and, in what she describes as the worst year of her life, she also became pregnant, gave birth, and then gave up her daughter for adoption. To her credit, she has stayed in touch with her daughter and was making strides toward putting her own life back together. Barrows graduated High School in Illinois, and then college at the University of Athens (Ohio). In August 2019, she began working at the Alvis House as a case manager. That's when she met William Dishman, and that's when things *really* took a turn for the worst.

Since meeting (and later marrying) Dishman, Emma Barrows:

- Lost her job at the Alvis House due to her inappropriate relationship with him;

- Began having suicidal thoughts;

- Separated from Dishman for a brief time due to infidelity;

- Reunited with him in May 2020;

- Began abusing methamphetamine with Dishman and his former lover/mother of his ten-year-old son;

- Filed domestic violence charges against him and alleged that he punched her in the eye and threatened her with a firearm; and

- Caught this federal case after attempting to hide Dishman from authorities.

7

Barrows's mother and father both recognize the devastating impact that Dishman has had on her life. Her mother describes her as "empathetic, intelligent, and loving to a fault," and as someone who "only sees the good in people and can sometimes make poor choices because of that." Her father rightfully "blames [Dishman] for their daughter's involvement with the court system." The Government agrees. But for William Dishman, Barrows would likely still be employed at the Alvis House or another treatment center and may have even completed her master's degree. At the very least, she would not be in federal court for sentencing.

The Government recognizes the powerful mitigating factors at play in this case given Barrows's personal history and characteristics, as well as the potential for a better life moving forward. For those reasons, the Government recommends a probationary sentence in lieu of any term of incarceration.

### 3. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and affords adequate deterrence. 18 U.S.C. § 3553(a)(2)(A)-(B). The Government submits that a sentence of one year of probation will adequately accomplish these goals. Lying to federal agents who are executing an arrest warrant on a fugitive is no small matter, and there must be *some* punishment imposed to reflect the seriousness of that offense and to promote respect for the law. But a probationary sentence can accomplish those goals while also providing just punishment for Barrows and affording her, and society, with some measure of deterrence moving forward.

8

### 4.  The Need to Protect the Public

The Court must also consider the need for the sentence imposed "to protect the public from further crimes of the defendant."  *Id.* § 3553(a)(2)(C).  Emma Barrows, standing alone, poses no risk of harm to the public moving forward.  But Emma Barrows still married to, and still supportive of William Dishman, presents a different calculus.  Neither the Government nor the Court can (or should) serve as the relationship police.  But by imposing a sentence and judgment in this case for a felony offense, the Government and the Court can ensure that Barrows will no longer be able to purchase a firearm for Dishman once he is released from custody.  That alone is a worthwhile step toward protecting the public.  As such, a custodial sentence seems greater than necessary to accomplish this particular goal of sentencing, and a probationary sentence will again suffice.

### 5.  The Kinds of Sentences Available and the Sentencing Range for the Applicable Category of Offense Committed by the Applicable Category of Defendant

Based on a Total Offense Level of 4 and a Criminal History Category of I, the guidelines range falls in Zone A of the sentencing table.  As such, "a sentence of imprisonment is not required," U.S.S.G. § 5C1.1(b), and "a sentence of probation is authorized," *id.* § 5B1.1(a)(1).  By law, any term of probation imposed for a felony offense must be "not less than one nor more than five years."  18 U.S.C. § 3561(c)(1).  Under the Sentencing Guidelines, the recommended term of probation is between one and three years.  U.S.S.G. § 5B1.2(a).  The Government respectfully submits that a low-end guidelines sentence of one year of probation is sufficient.

9

6. The Need to Avoid Unwarranted Sentencing Disparities

Finally, the Court must craft a sentence that accounts for "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Government submits that a within-guidelines term of one year of probation would best meet this goal. *See United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2018) ("Considering that one of the fundamental purposes of the Guidelines is to help maintain national uniformity in sentences, and considering that most sentences are within the Guidelines, the Guidelines themselves represent the best indication of national sentencing practices.").

## IV. CONCLUSION

For these reasons, the United States respectfully requests that the Court sentence Emma Barrows to a one-year term of probation.

Respectfully Submitted,

KENNETH L. PARKER
United States Attorney


s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 469-5715
Email: Noah.Litton@usdoj.gov

10

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Sentencing Memorandum was served electronically on all counsel of record on this 2nd day of February, 2023.

                                              s/Noah R. Litton
                                              NOAH R. LITTON (0090479)
                                              Assistant United States Attorney